**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                           |   |                          |
|---------------------------|---|--------------------------|
|                           | * |                          |
| NATHAN VONGOHREN, *et ux.* | * |                          |
|                           | * |                          |
| v.                        | * | Civil No. JFM-14-3549    |
|                           | * |                          |
| CITIMORTGAGE, INC.        | * |                          |
|                           | ****** |                      |

## MEMORANDUM

Plaintiff Nathan Vongohren and his wife, Shelley Vongohren, bring suit against defendant CitiMortgage, Inc. ("Citi") seeking damages for breach of contract, conversion, unfair and deceptive trade practices, and constructive fraud.  Citi counterclaims for breach of contract.  Now pending is Citi's motion for summary judgment on the Vongohrens's complaint and its own counterclaim.  The parties have fully briefed the motion, and no oral argument is necessary.  *See* Local Rule 105.6.  For the reasons below, the motion is granted.

## BACKGROUND

The parties' dispute arises out of Nathan Vongohren's and his wife, Shelley Vongohren's 2005 purchase of a house ("the property") in Centreville, Maryland.  Part of the purchase was financed by a Deed of Trust ("loan agreement") in the amount of $251,000, for which Citi acted as the loan servicer.[1]  (*See* ECF No. 56, Ex. 3).  Starting in October 2008, plaintiffs began missing payments on the loan.  (*See* ECF No. 56, Ex. 4, ¶ 6).  In the twenty five months between October 2008 to October 2010, Citi's payment history on the Vongohrens's loan—which both Vongohrens have characterized as accurate, (*see* ECF No. 56, Ex. 1, 31:19–8, Ex. 5, 25:14–28:6)—shows the Vongohrens made only three full loan payments and eleven partial payments.

---

[1] The beneficial owner of the loan is Federal Home Loan Mortgage Corporation ("Freddie Mac").  (ECF No. 56, Ex. 4, ¶ 5).

(*See* ECF No. 56, Ex. 6, pp. 3–5).  In the other eleven months, the Vongohrens made no

payments.[2]  *See id.*

In November 2010, Citi advised the Vongohrens they had been delinquent on their loan

since November 2009, and it required a payment of the Vongohrens's late balance of $27,664.19.

(ECF No. 56, Ex. 8, p. 230).

In approximately March 2011, the Vongohren family left the property and moved to

Texas.  (ECF No. 56, Ex. 1, 65:9–20).  Around September of the same year, on the advice of a

lawyer litigating class action claims against Citi, the family moved back to Maryland and

resumed living at the property.  (*See* ECF No. 56, Ex. 11, 5:12–6:12).  However, while the

Vongohren family was in Texas, unbeknownst to them, the property's basement had flooded as a

result of a recent hurricane.  (*See* ECF No. 56, Ex. 1, 69:5–11).  The Vongohrens filed a

homeowners' insurance claim with Nationwide Mutual Insurance Company ("Nationwide"),

which Nationwide then paid.  (*See* ECF No. 56, Ex. 1, 91:15–93:22, Ex. 11, 6:14–18).

Throughout this period, there is no evidence the Vongohrens made loan payments to Citi.

---

[2] Because of the Vongohrens's difficulty making payments, the parties attempted to negotiate a
loan modification amenable to both sides.  One proposed loan modification discussed by the
parties was the Home Affordable Modification Plan ("HAMP").  HAMP "was part of Congress's
response to the financial and housing crisis that struck the country in the fall of 2008."
*Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 773 (4th Cir. 2013).  The HAMP
modification process consists of two stages, the first of which is a Trial Period Plan ("TPP")—if
a borrower successfully completes a TPP, they will receive a permanent modification on the
same terms.  The Vongohrens's draft TPP provided that if the Vongohrens received "a fully
executed copy of a Modification Agreement," and were in compliance with the terms of the
TPP—requiring, *inter alia*, three monthly payments of $1736.60 a month starting in July 2009—
Citi would provide the Vongohrens with a Modification Agreement amending their loan.  (ECF
No. 59, Ex. C, pp. 1, 2).  However, there is no evidence the Vongohrens's draft TPP was ever
executed—while Nathan Vongohren signed the document, Citi did not.  (*See id.* at p. 3).  Further,
Citi's records show plaintiffs missed two of the three payments required by the TPP.  (*See* ECF
No. 56, Ex. 6, pp. 3–4).  In May 2010, when Citi advised plaintiffs they would need to continue
making "normal payment[s]," Shelley Vongohren objected, stating she would continue making
trial payments (presumably under the TPP) "no matter what [Citi] say[s]."  (*See* ECF No. 56, Ex.
8, p. 235).

Shortly thereafter, due to a black mold infestation in the house, the Vongohrens again moved out of the property. (*See* ECF No. 56, Ex. 1, 73:8–74:4, 77:4–7). The Vongohrens asked a friend to house sit the property; however, continuing their saga of misfortune, instead of taking care of the property, the friend stole items from it and abandoned it. (*See* ECF No. 56, Ex. 11, 7:14–8:2). Then in July and August, while the property sat empty, the property was vandalized. *See id.* at 8:22–9:2; 10:5–17. The damage to the home was significant, including damage to the masonry, fireplace, walls, ceilings, electrical system, furnace, windows, and doors. (*See* ECF No. 56, Ex. 8, p. 152). Nathan Vongohren described it as a "complete rip-down" and "unlivable." (ECF No. 56, Ex. 1, 137:1–8)

In September 2012, the Vongohrens's former real estate agent informed Citi that the Vongohrens had abandoned the property and "someone has broken into the property and has done alot [*sic*] of damage to the home." (ECF No. 56, Ex. 8, p. 152). Through a third party property security company, Citi moved to secure the property and file an insurance claim for vandalism with Nationwide.[3] (*See* ECF No. 56, Ex. 8, p. 152; Exs. 14, 15). Nationwide notified the Vongohrens of the vandalism claim in a September 2012 letter, and also asked them to schedule an interview with Nationwide. (ECF No. 56, Ex. 15).

After an investigation, Nationwide granted Citi's and the Vongohrens's claim in part for $101,466.63, (*see* ECF No. 59, Exs. D, E), but denied the claim as it related to damage to the "exterior window[] frames," "the (basement) walls," "ground pool," and "[t]he detached garage" caused by "wear, tear and neglect." (*See* ECF No. 56, Ex. 20, p. 1). Citi deposited the insurance proceeds in its own accounts. (*See* ECF No. 56, Ex. 4, ¶ 16).

---

[3] Citi had purchased and was making payments on a home insurance policy for the property. (*See* ECF No. 59, Ex. H, ¶ 6).

During this time, ostensibly to evaluate the feasibility of repair of the property, Citi commissioned a Broker's Price Opinion ("BPO") evaluating the state of the property and sent the BPO to the beneficial owner of the loan, Freddie Mac.  (ECF No. 56, Ex. 8, p. 129).  The BPO estimated that the necessary repairs would only add $35,000 in value to the $310,000 "as-is" value of the house, and repairs would cost $67,500; accordingly, the BPO recommended against repair, suggesting instead that the property be "gutted and rebuilt."  (ECF No. 56, Ex. 22, p. 1919).  Additionally, Citi's records showed that repairs would have been difficult for another reason: the local sheriff had informed the Vongohrens that armed squatters had taken over the property.  (ECF No. 56, Ex. 8, p. 137).  Subsequent to receipt of the BPO, in March 2013, Freddie Mac instructed Citi to foreclose on the property.  (ECF No. 56, Ex. 4, ¶ 17; Ex. 8, p. 129).

In March 2014, Citi notified the Vongohrens that it was initiating foreclosure proceedings against them.  (*See* ECF No. 59, Ex. G, ¶ 19).  Approximately half a year later, plaintiffs filed their complaint in the Maryland Circuit Court for Queen Anne's County, alleging breach of contract, fraud and conversion, unfair or deceptive trade practices, and constructive fraud relating to the $101,466.63 in insurance proceeds received by Citi.  (*See* ECF No. 2).  Defendants removed the case to this court.  (ECF No. 1).  Citi filed a motion to dismiss (ECF No. 12), which I denied in part and granted in part with respect to plaintiffs' fraud claim.  (*See* ECF No. 29).  Citi then filed a counterclaim for the amount due on plaintiffs' loan.  (*See* ECF No. 30).  Currently pending is Citi's motion for summary judgment on plaintiffs' claims and Citi's counterclaim.  (ECF No. 56).

**STANDARD**

Under Federal Rule of Civil Procedure 56(c), a court grants summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247 (1986). A genuine issue of material fact exists where, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, when reviewing a motion for summary judgment, the court must look at facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

While the moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact, trial courts have an obligation to prevent "factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323–24). In response to a properly supported motion for summary judgment, the non-moving party must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248–49; *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970). A court should also enter summary judgment when a party fails to make a showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## ANALYSIS

Defendants seek summary judgment on each of plaintiffs' four claims and on its own counterclaim. I consider each of the claims in turn.

## I.       Breach of Contract

Plaintiffs allege that Citi breached its contractual obligations under the parties' loan agreement.  I find that there is no genuine issue of material fact with respect to whether Citi has breached its contract with plaintiffs and thus, summary judgment is appropriate for Citi on this count.

As a preliminary matter, plaintiffs' breach of contract claim is somewhat muddled in what it alleges.  In their complaint, plaintiffs allege that Citi "breach[ed] [the loan agreement] by a continuing pattern of non-feasance, misfeasance, and malfeasance," but fail to state which substantive provisions Citi has breached or by which legal theory Citi has breached the contract. (*See* ECF No. 2, ¶ 20).  In their Opposition to Citi's motion, plaintiffs elaborate, stating that "CITI lied to the plaintiffs concerning their insurance claim; wrongfully negotiated insurance checks made to the plaintiffs' order; and wrongfully appropriated the proceeds of these checks totaling $101,446.63." (ECF No. 59, p. 8).  For the purposes of summary judgment, I assume that plaintiffs allege Citi breached their loan agreement by failing to turn over the $101,466.63 in insurance proceeds to plaintiffs or, alternatively, by failing to use the insurance proceeds to repair plaintiffs' property.[4]

Because the parties contracted in Maryland, Maryland law applies to the dispute.  Under Maryland law, "the interpretation of a contract . . . is a question of law." *Washington Metro.*

---

[4] For the first time in their Opposition, plaintiffs allege Citi breached the parties' loan modification agreement.  (*See* ECF No. 59, p. 9).  This is improper because plaintiffs never pled facts relating to a loan modification in their complaint.  *See* Fed. R. Civ. P. 8(a) (a pleading must set forth facts stating a claim); *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013) (holding that a plaintiff's assertion of a new argument at the summary judgment stage was "an impermissible attempt to constructively amend the complaint").  Further, notwithstanding plaintiffs' failure to plead this claim in their complaint, there is simply no evidence showing that a loan modification was ever executed.  The uncontroverted evidence, (*Compare* ECF No. 56, Ex. 7, p. 3 *with* ECF No. 59, Ex. C, p. 3) shows that Citi never signed the TPP, which was the first step to a loan modification.

*Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 234 (4th Cir. 2007).  To show

a breach of contract, a plaintiff must show both the existence of "1) a contractual obligation and

2) a material breach of that obligation."  *Chubb & Son v. C & C Complete Servs., LLC*, 919 F.

Supp. 2d 666, 678 (D. Md. 2013) (internal citations and quotation marks omitted).  When

evaluating these two elements, "Maryland contract law requires courts to construe contracts in

conformance with the parties' intent."  *Crofton Convalescent Ctr., Inc. v. Dep't of Health &*

*Mental Hygiene, Nursing Home Appeal Bd.*, 991 A.2d 1257, 1268 (Md. 2010).  To understand

and interpret the parties' intent, a court looks first to the language of the contract; but, if the

language of the contract is ambiguous, it may then look to extrinsic evidence.  *Cty. Comm'rs of*

*Charles Cty., Md. v. Panda-Brandywine, L.P.*, 663 F. Supp. 2d 424, 428 (D. Md. 2009).

On the topic of insurance proceeds, the parties' loan agreement provides, in relevant

part, that:

> Unless Lender and Borrower otherwise agree in writing, any
> insurance proceeds, whether or not the underlying insurance was
> required by Lender, shall be applied to restoration or repair of the
> Property, if the restoration or repair is economically feasible and
> Lender's security is not lessened . . . . If the restoration or repair is
> not economically feasible or Lender's security would be lessened,
> the insurance proceeds shall be applied to the sums secured by this
> Security Instrument, whether or not then due, with the excess, if
> any paid to the Borrower.

(ECF No. 56, Ex. 3, ¶ 5).  The plain language of the contract indicates that if repair is

economically feasible *and* Lender's security is not lessened, insurance proceeds must be applied

to repair; however, in the event that one or both conditions do not exist, the insurance proceeds

must instead be applied directly to the loan.[5]  Accordingly, the proper inquiry in the instant case

---

[5] As the Seventh Circuit has noted, ¶ 5 "exists almost exclusively for CitiMortgage's benefit,"
and without it, a borrower "could use the insurance proceeds to repair his house or pay down his
loan at his discretion."  *Avila*, 801 F.3d at 784.

with respect to the disputed insurance proceeds is whether: (1) repair was economically feasible;

and (2) Citi's security would be lessened by a repair. *See Avila v. CitiMortgage, Inc.*, 801 F.3d

777, 784 (7th Cir. 2015) (considering an identical clause and stating, "[t]he mortgage agreement

shifts . . . discretion to CitiMortgage to ensure that repairs are 'economically feasible,' [and] that

its 'security is not lessened'").

### A.  Economic Feasibility

There is no genuine dispute of material fact as to whether repair was economically

feasible.  Feasibility is defined as "[t]he possibility that something can be made, done, or

achieved, or that it is reasonable; practicability." *Feasibility*, BLACK'S LAW DICTIONARY (10th

ed. 2014).  Because "economically" modifies "feasible" in the parties' loan agreement, and

defining "economically feasible" as simply "economically possible" has no limiting principle,

the best interpretation of "economically feasible" is "economically reasonable" or "practicable."

In the instant case, it was neither economically reasonable nor practicable for Citi to use

the $101,466.63 in insurance proceeds to repair the property.  It is undisputed that the

Vongohrens had not made payments on the loan agreement since October 2010, more than three

years before the Vongohrens filed their complaint.[6]  Moreover, the Vongohrens repeatedly

evinced their intent to continue not making their loan payments, (*see* ECF No. 56, Ex. 1, 134:18–

21; Ex. 8, pp. 128–29 ("[Nathan Vongohren] said he will not give us a dime"); Ex. 8, pp. 143,

235), and Citi had no reason to believe they would resume making the payments.  This alone

---

[6] The Vongohrens baldly assert that they were "paying the mortgage as required by the parties'
mortgage modification agreement until . . . CITI began refusing the payments . . . ."  (ECF No.
59, p. 10).  This allegation is unsupported.  First, as noted *supra*, the Vongohrens fail to show
that any mortgage modification agreement exists; consequently, payments pursuant to any
putative mortgage modification agreement would still put the Vongohrens in default of their
original loan agreement.  Second, while the Vongohrens allege Citi began refusing payments on
the mortgage modification agreement, there is no evidence of this in the record.

may be sufficient, as a matter of law, to make repair economically infeasible.  *See Everidge v. Wells Fargo Bank*, No. 5:12-497, 2015 WL 5786738, at *17 (M.D. Ga. Sept. 29, 2015) (considering an identical insurance clause and concluding that: "[w]here, as here, a borrower is in default at the time the property is destroyed, or later falls into default while the property is being repaired, it is not economically feasible for the bank to complete the repair in lieu of applying the insurance proceeds to the outstanding balance of the loan."); *but see Avila*, 801 F.3d 777 at 787 (holding that a borrower's material breach by itself is insufficient to excuse lender's obligations under ¶ 5).

There is, however, more.  The Vongohrens had, for all intents and purposes, abandoned the property.  The Vongohrens stopped paying rent; moved at least three times after leaving the property, (*see* ECF No. 56, Ex. 1, 85:4–89:2); left the property unsecured, leaving it vulnerable to vandalism and squatting, (s*ee* ECF No. 56, Ex. 11, 20:25–21:23); cancelled their property insurance, (*see* ECF No. 56, Ex. 17); and told Citi they were going to wait for foreclosure so they could "sue the company," (ECF No. 56, Ex. 8, p. 143).  Thus, it is hard to see what the Vongohrens or Citi would have gained by repairing the property.[7]  Further, the BPO, to which the Vongohrens proffer no countervailing evidence, demonstrates that the cost of repairs significantly outweighed any value added by repairing the property.  (ECF No. 56, Ex. 22, p. 1919) (showing an economic loss of between $8,000 and $32,500 for repairs depending on the marketing time of the property).  Accordingly, because the insurance proceeds were worth more as unapplied funds than if they were directed toward repairs, repairs provided no benefit to either

---

[7] The Vongohrens argue that they "believe they can use the $101,446.63 to rebuild a very nice home on the property they already have."  (ECF No. 59, p. 10).  This contention is unpersuasive. First, the Vongohrens submit no evidence showing that a repair would be feasible—to the contrary, Nathan Vongohren characterized the property as "a complete rip-down."  (ECF No. 59, Ex. 1, 137:4).  Second, the Vongohrens fail to proffer any evidence showing they intend (or have the capacity) to move back to the property or become current on their loan payments.

the Vongohrens or Citi. Given the Vongohrens's refusal to continue making payments, their de facto abandonment of the property, and the projected economic loss of making repairs, there is no genuine dispute of material fact that it was not "economically feasible" for Citi to use the insurance proceeds on repairs. On this ground alone, summary judgment is appropriate for Citi on the Vongohrens's breach of contract claim.

### B. Security Interest

There is also no genuine dispute of material fact as to whether Citi's security interest would be lessened if the insurance proceeds were applied to repairs. Again, the BPO, commissioned by Citi to determine the viability of repairs, shows that the economic loss of repairs to Citi's collateral was anywhere between $8,000 and $32,500 depending on how long it took to sell the property. (ECF No. 56, Ex. 22, p. 1919). The Vongohrens cite no evidence disputing this estimate. Therefore, forcing Citi to repair the property would lessen the value of Citi's security interest in the property, and on this independently sufficient ground, summary judgment is appropriate for Citi on the Vongohrens's breach of contract claim. *Cf. In re Hill*, No. 08-36267, 2011 WL 6936357, at *12 (Bankr. S.D. Tex. Dec. 30, 2011) (examining the same insurance clause at issue here and noting that the language shows a lender "has more than an abiding interest in ensuring that the value of its collateral (i.e., the Debtor's homestead) is maintained, if not enhanced").

Because there is no genuine issue of material fact as to either the economic feasibility of repairing the property or whether repairs would lessen Citi's security interest, summary judgment is appropriate for Citi on the Vongohrens's breach of contract claim.[8]

---

[8] Alternatively, the Vongohrens' breach of contract claim is also barred because they did not inform Citi of the alleged breach and afford it an opportunity to cure. ¶ 20 of the parties' loan agreement provides that before taking judicial action, a party must notify its counterpart in

## II.      Conversion

The Vongohrens accuse Citi of unlawfully converting the insurance checks with "actual malice," and seek compensatory as well as punitive damages on this count.  (ECF No. 2, ¶¶ 22, 26).  As an initial matter, there is some dispute over whether the Vongohrens have asserted conversion of the insurance checks or the resulting proceeds.  (*Compare* ECF No. 59, p. 12–13 *with* ECF No. 60, p. 10).  The Vongohrens contend they have set forth a claim for conversion of the insurance checks, while Citi claims they have not.  Even assuming *arguendo* the Vongohrens are correct on the point, summary judgment for Citi is still appropriate on this claim.

Under Maryland law, conversion is "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *First Union Nat. Bank v. New York Life Ins. & Annuity Corp.*, 152 F. Supp. 2d 850, 854 (D. Md. 2001) (internal quotation marks and citations omitted).  To establish conversion, a plaintiff must show: "(1) plaintiff's right to possess the property; and (2) defendant's intentional taking of the property without authority or permission." *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000) *aff'd sub nom. Froelich v. Senior Campus Living, LLC*, 5 F. App'x 287 (4th Cir. 2001). Thus, to recover for conversion, "one must either have been in actual possession or have had the right to *immediate possession*." *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1066 (Md. App. 1986) (emphasis in original).

The Vongohrens's claim for conversion fails because they do not proffer any evidence showing they had a possessory right to the insurance checks and that Citi took the checks without

---

writing "of such alleged breach and afford[] the other party hereto a reasonable period after the giving of such notice to take corrective action."  (ECF No. 56, Ex. 2, ¶ 20).  The Vongohrens acknowledge that they never informed Citi of their claim in writing before filing a complaint. (ECF No. 56, Ex. 5, 102:1–10; *see also* Ex. 4, ¶ 22).  Accordingly, on this ground too, summary judgment is appropriate for Citi.

authority or permission.  Since the checks constituted insurance proceeds, ¶ 5 of the parties' loan agreement governs whether the Vongohrens were entitled to the insurance checks.  As discussed *supra* in Part I, there is no genuine dispute of material fact that the insurance checks "shall be applied to" the loan.  (ECF No. 56, Ex. 3, ¶ 5).  The Vongohrens have failed to show that any reasonable juror could find they were entitled to the insurance checks; therefore, summary judgment is appropriate for Citi on the Vongohrens's conversion claim.  *See Froelich*, 96 F. Supp. 2d at 525–26 (granting defendants' motion for judgment on a conversion claim because defendants had "authority" to take the property).

### III.    Unfair or Deceptive Trade Practices

In Count III of their complaint, plaintiffs allege defendant committed unfair or deceptive trade practices in violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101 *et seq.*

The MCPA prohibits unfair or deceptive trade practices in the "sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services," and in the "extension of consumer credit."  Md. Code Ann., Com. Law §§ 13-303(1); 13-303(4).  Unfair or deceptive trade practices include, "false . . . or misleading oral or written statement[s] . . . which [have] the capacity, tendency, or effect of deceiving or misleading consumers;" and "[f]ailure to state a material fact if the failure deceives or tends to deceive."  Md. Code Ann., Com. Law §§ 13-301(1); 13-301(3).  To prevail on an MCPA claim, a plaintiff must show: "(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury."[9]  *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012) *aff'd sub nom. Lembach*

---

[9] Plaintiffs argue that a consumer need not be "damaged" as a result of any MCPA violation to assert a successful private cause of action under the statute.  (ECF No. 59, p. 15).  This is flatly false.  *See Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 796 (D. Md. 2013).

*v. Bierman*, 528 F. App'x 297 (4th Cir. 2013).  The injury must be "identifiable . . . measured by the amount the consumer spent or lost as a result of his or her reliance on the [defendant's] misrepresentation."  *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007)

Although the record evidence on plaintiffs' allegations of unfair and deceptive trade practices and reliance on those trade practices is sparse, even taking those allegations as true, plaintiffs' MCPA claim fails because they cannot show actual injury.  Plaintiffs allege that they suffered injury because Citi "fail[ed] to utilize funds properly received for the care of property for the benefit of the Plaintiffs as required by their contract and by law."  (ECF No. 2, ¶ 27). Under ¶ 5 of the loan agreement, however, plaintiffs cannot show that Citi was required to use the insurance proceeds to repair the property.  Accordingly, the result—unfortunate as it may be—for the Vongohrens would have been the same regardless of what Citi told them.  That is, even if Citi had made all of the misrepresentations plaintiffs allege, plaintiffs would have suffered the same injuries (e.g. "the cost of their home," "rental expenses," "moving expenses," and "disruption in employment," (ECF No. 59, p. 16)), because Citi was entitled to use the insurance proceeds to pay off plaintiffs' loan obligation instead of repairing the uninhabitable property.  At bottom, plaintiffs' knowledge of the insurance proceeds is simply immaterial to Citi's legal right to apply the proceeds to the loan obligation, and thus plaintiffs can show no injury.

The nub of the parties' dispute, here and on plaintiffs' other counts, is whether Citi has properly held insurance proceeds to pay off the Vongohrens's loan obligations; because plaintiffs cannot offer "concrete evidence from which a reasonable juror could return a verdict in [their] favor" on this issue, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986), Citi's motion for summary judgment on plaintiffs' MCPA claim is granted.

## IV.    Constructive Fraud

In Count IV of their complaint, plaintiffs allege Citi committed constructive fraud. Specifically, plaintiffs allege that Citi took control of the insurance checks, creating a fiduciary duty between Citi and the plaintiffs, which Citi then breached by using the insurance checks for its own purposes.  (ECF No. 59, p. 17).  Plaintiffs' argument again rests on the premise that Citi was not entitled to apply the insurance proceeds to their loan obligation.  Because plaintiffs have not shown a genuine dispute of material fact on this issue, Citi's motion for summary judgment on plaintiffs' constructive fraud count is granted.

## V.    Defendant's Counterclaim

Defendant also seeks summary judgment on its counterclaim for the unpaid balance of the parties' loan.

As they relate to Citi's counterclaim, the undisputed facts are as follows:

- The parties signed a loan agreement and note requiring the Vongohrens to make a monthly payment toward the loan's principal and interest.  (*See* ECF No. 56, Ex. 3, ¶ 1).
- The parties agreed that if the Vongohrens did not "pay the full amount of each monthly payment on the date it is due," they would be in default.  (ECF No. 56, Ex. 2, ¶ 6).
- The Vongohrens started periodically missing required monthly payments in October 2008, and entirely stopped making payments in October 2010.  (*See* ECF No. 56, Ex. 6, pp. 3–5).
- Citi notified the Vongohrens on several occasions they were in default of their obligations and Citi has now accelerated the amount due under the Note, "demanding full payment."  (*See* ECF No. 56, Ex. 4, ¶ 21; Ex. 25 (three different notices of Citi's intent to foreclose)).

The facts establish that the Vongohrens were in material breach of the loan agreement and that no genuine dispute exists with regard to the issue.  Thus, summary judgment is appropriate for Citi on the issue of the Vongohrens's liability.[10]

There is, however, one issue left to be resolved, which is Citi's damages, an issue left largely untouched by both parties' briefing.  For its part, Citi alleges that as of November 20, 2015, the Vongohrens owe $406,655.41 on the loan.[11]  Because they do not concede their liability, the Vongohrens do not discuss damages.  Citi's figure excludes the $101,466.63 in insurance proceeds disputed by the parties.  Citi has held the proceeds since late 2012, when it received them.

As discussed *passim*, ¶ 5 of the parties' loan agreement provides that, if, as here, use of the insurance funds to repair the property is economically infeasible or would lessen Citi's security interest, "the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any paid to the Borrower."  (*See* ECF No. 56, Ex. 3).  ¶ 5 provides no timeframe for the application of the insurance proceeds, but it makes clear the use of the funds to pay off the Vongohrens's loan is mandatory—the proceeds "shall" be applied to the loan.  Where a contract does not specify a time for performance, "a reasonable time will be implied."  *Mayor & City Council of Baltimore v. Unisys Corp.*, 59 F. Supp. 3d 729, 733 (D. Md. 2014) (citing *Giannaris v. Cheng,* 219 F.Supp.2d 687, 694 (D.Md.2002); *Arundel Cnty. v. Crofton Corp.*, 410 A.2d 228, 232 (Md. 1980); 17A Am.Jur.2d Contracts § 467 (2014)) (internal quotation marks omitted); *see also Ferguson v. Upper*

---

[10] The Vongohrens argue their breach is excused because Citi refused to accept payments under a loan modification agreement and stole their insurance proceeds.  These claims have been addressed, and found unavailing *supra*.

[11] Citi arrives at this figure by summing the principal balance of the loan, $239,803.04 and interest due, which is to be paid at a rate of 6.375% per year plus late charges of 5% of overdue payments of principal and interest.  (*See* ECF No. 56, p. 12, Ex. 2, ¶¶ 2, 5).

*Chesapeake Med. Servs., Inc.*, 91 F.3d 130 (4th Cir. 1996) ("If the agreement does not specify the duration of that opportunity, the law implies a reasonable time").   And, "when the facts are undisputed and they support only one inference regarding the reasonableness of the time, the court may decide the question as a matter of law."  *Ferguson v. Upper Chesapeake Med. Servs.*, Inc., 91 F.3d 130 (4th Cir. 1996) (citing Maryland law).

The undisputed facts are that Citi, which, at any time, could have used the insurance proceeds to pay off part of the loan, allowed the insurance proceeds to languish in its accounts for over three years, allowing the Vongohrens's interest and late payments to pile up. Accordingly, in my estimation, and the parties may contest this by filing a motion to reconsider or amend, Citi did not use the insurance proceeds to pay off the loan in a "reasonable time." Citi should have instead used the insurance proceeds to pay off the loan on or shortly after March 13, 2013, when the beneficial owner of the loan, Freddie Mac, instructed Citi to proceed to a foreclosure sale instead of pursuing repair.  (*See* ECF No. 56, Ex. 8, p. 129).  At that point, there was no excuse for a delay in applying the disputed funds—Citi knew that repair of the property was economically infeasible and would lessen its security interest in the property.  Citi is instructed to submit a damages figure, by affidavit, reflecting what the Vongohrens would now owe if the insurance proceeds had been applied to the loan on March 13, 2013.

## CONCLUSION

For the aforementioned reasons, Citi's motion for summary judgment (ECF No. 56) is granted.  On the issue of Citi's damages, Citi is instructed to file an affidavit reflecting what the plaintiffs would now owe if the insurance proceeds had been applied to the loan on March 13, 2013.  A separate order follows.

| 2/25/2016 | /s/ |
|---|---|
| Date | J. Frederick Motz |
| | United States District Judge |